Kimberly was convicted in a jury trial of first degree murder. Specifically, the jury found that on January 1, 2013, she stabbed and killed Elizabeth Jamieson without lawful justification and acting with knowledge that her conduct was likely to result in death or great bodily harm or intent to cause great bodily harm. She was sentenced to a term of 28 years imprisonment. The two issues are raised on appeal. In the first issue, the defendant maintains that she was not proven guilty of first degree murder beyond a reasonable doubt. And more specifically, that the defense presented evidence of all of the elements of self-defense, thus shifting the burden to the state to disprove self-defense beyond a reasonable doubt, but the state failed to carry its burden. And therefore, Kimberly Nowlan-McCue respectfully asks this court in issue 1 to reverse her conviction outright. Alternatively, in issue 2, she seeks a new trial because she received ineffective assistance of counsel, where her trial attorneys failed to object to or to seek redaction of statements made by a police officer on videotape during his interrogation of the defendant. In arguing it today, I intend to address both of these issues. The evidence of trial is undisputed, but on the day in question, there was a physical encounter between Nowlan-McCue and Jamieson outside Jamieson's residence that resulted in Jamieson's death. The issue for the trial of fact in this case, the jury, was the defendant's mental state. And specifically, whether she acted with a reasonable belief in the need to use deadly force because she herself was threatened with deadly force. Now, she was arrested shortly after the incident, brought to the police station, and interrogated, and the jury was shown the interrogation tape. Initially, she denied involvement, but she eventually admitted, yes, she was involved. She said she went to Jamieson's residence that day because she believed that Jamieson had told lies about her to her estranged husband. She therefore wanted to confront Jamieson about this. She denied bringing a weapon, denied attacking her, said she never thought there would be a physical confrontation. She just wanted to talk it out mother-to-mother. She said words were exchanged between the two of them outside of the residence, and that Jamieson then threw a punch at her. She responded by throwing a punch back at Jamieson. At that point, she saw a knife in Jamieson's hand, and she believed she was in mortal danger. The two women struggled over possession of the knife. At some point, she apparently obtained possession and apparently simultaneously inflicted the fatal wounds. Now, the judge found that this evidence was evidence as to all of the elements of self-defense, and so as a result, he instructed the jury on both self-defense and unreasonable belief in self-defense, second-degree murder. This thus shifted the burden to the state to disprove self-defense beyond a reasonable doubt. The prosecutor argued to the jury in closing, and Judge Erickson later repeated at sentencing that the defendant brought a knife to a fistfight. And what this case comes down to is really, was there proof that the defendant brought the knife? Who brought the knife? Who was the aggressor? Who attacked whom? And the defendant submits that a careful consideration of all of the evidence in this case does not show that the defendant brought the knife or that she attacked Ms. Jamieson. Now, of course, it was up to the jury to assess the credibility of the defendant's statements to the police, but there was another eyewitness who testified at trial, and his name was Richard Silva. Silva and the defendant and two others shared a house. Now, unless your honors believe that that relationship gave him a reason to help out the defendant, he told police that he was best friends with Jamieson, so it would appear he was, by and large, an objective observer. He sat in the defendant's car while the confrontation took place, and he testified that when the defendant got out of the car, she had nothing in her hands, not a knife, not anything else. Furthermore, that morning, the two of them had been running errands, and then she is the one who drove to the scene. So it doesn't seem likely that she could have had a knife unless she somehow reached for it, grabbed it inside the car before leaving the car, and he said he didn't see her do that. Any evidence there was a purse or whatever? There was a purse in the back seat of the car. There was a knife inside the purse. However, the police found blood in the front of the car, apparently from when the defendant got back into the car after the incident. But there was no blood on the back seat. There was no blood on the purse. There was no blood on the knife. And apparently for those reasons, police did not even submit the knife to the crime lab because just looking at it, I think they basically ruled it out as possibly having been the murder weapon. Was the murder weapon recovered? The murder weapon was never recovered. Now, if the defendant did not have a knife in her hands when she got out of the car, could she have concealed it out of her purse? The evidence showed that she was wearing the same clothes in the interrogation room as the clothes she wore at the time of the incident. In fact, there was blood on those clothes. And it showed she was wearing sweatpants and some sort of a pullover, like a sweatshirt, sweater, that type of thing. Officer Ivey, who interrogated her, testified there were no pockets on the sweatpants. Now, he didn't say anything about the pullover. I would invite the court to take a look at that videotape of the interrogation. It's certainly not high def, but it doesn't look to me like there are any pockets on the pullover. So she didn't have in her hands any pockets. It makes it less likely that she could have introduced the knife. Lucila also testified that he did not see a knife in Jamison's hands. But his view of Jamison was obstructed. Again, he's sitting in the car. He says at the time of the confrontation, he's basically looking towards the woman, and Jamison's facing him. But the problem is that the defendant is standing between him and Jamison facing Jamison. So at that point, he really can't see either of their hands. At one point, he sees their hands up in the air and does not see a weapon. Now, Jamison's boyfriend was at home at the time of the incident. Again, he testified that he did not witness the encounter. However, he did say that when Jamison left the house, he didn't see anything in her hands. However, the pathologist's report also showed that she was wearing blue denim pants. It strikes me that they would be similar to jeans, a good possibility that they would have pockets. So the defense is on this evidence. It's more likely that Jamison had the knife. So they testified again. They're running errands that morning. And at one point, the defendant says to him that she's going to go over to Jamison's. And he didn't think anything really bad was going to take place. He didn't envision a fight. But he thought they were going to argue back and forth. He really didn't want to be a part of it. And so he asked her to drop him off at home. And he told police that her response to that request was, no, I need you as a witness. Now, the state's theory of the case is the defendant goes over there. She's in a rave. She brings a knife. And she makes an unprovoked attack upon Ms. Jamison. If, in fact, that was her mindset when she went to the residence, the last thing she's going to do is to bring a witness and tell him, I need you as a witness. That statement is much more consistent with her statement to the police that she just went there to talk it out. She believed that Jamison had lied to her estranged husband. And therefore, perhaps she's thinking maybe Jamison will admit that so that she can then tell that to her estranged husband and she can have Silva as a witness. On top of all of that, the evidence did not show that the house that these people shared was clear across town. The evidence showed their house was right around the corner from Jamison's residence. So she could have quickly dropped him off before going there if she was going to go there to attack this woman. Now, all of this evidence strongly suggests that it was not Ms. Nolan McHugh who brought the knife. It was not Ms. Nolan McHugh who was the attacker in this case. And most importantly, as a result of this evidence, the state simply did not disprove self-defense beyond a reasonable doubt. I'm sure, Your Honors, that the jury could have only guessed, could have only speculated that the defendant brought the knife, that the defendant was the aggressor. But of course, as Your Honors know, speculation does not rise to the level of proof beyond a reasonable doubt. And for these reasons, Ms. Nolan McHugh respectfully asks Your Honors to carefully look at the evidence in the case and to reverse outright. Now, even if Your Honors do not do that, I would submit, you have to agree on this record, the question of self-defense was extremely closely balanced. And therefore, any trial error was likely to be a reversible error. The defendant's trial error occurred in this case when the jury was allowed to hear evidence it should never have heard. On the interrogation videotape, Officer Ivey talks about apparent knife wounds on the defendant's hands, one or both of her hands. In fact, I submit to the court that that's another reason, another fact, suggesting she acted in self-defense. She apparently had wounds both on the front and the backs of her hands, and many of them. At one point, Officer Ivey says to her that those looked to him more like slippage wounds as opposed to defensive wounds. And I think we all know what defensive wounds are. Your Honors may well be familiar with slippage as well, although they're more uncommon. Slippage wounds tend to arise when an individual is stabbing, blood gets onto the knife, making it slippery, causing the person's hand to slip off the handle or hit the knife onto the knife blade. Defensive wounds, generally consistent with self-defense. Slippage wounds, generally inconsistent with self-defense. And I've studied numerous cases where there has been evidence presented to the jury about these types of wounds and opinions provided generally by medical experts, and perhaps Officer Ivey had the requisite experience and qualifications to be an expert here. The one problem is we don't know if he was or wasn't, because although he testified at trial, he didn't say anything in his testimony about these wounds. Those opinions only came out through the videotape. And, of course, there's nothing on the videotape whether he was really qualified to give that opinion. Furthermore, whether or not he was qualified to give that opinion, we have no idea whether he was being sincere. Because, of course, as the court knows, police are not required to be honest or forthright with suspects during interrogation. The law allows officers to mislead or even make mainly false statements as an interrogation tactic or strategy. We don't know if that happened here. So for all of these reasons, this evidence should not have come before the jury, and it was incumbent on defense counsel to either object or seek redaction of the tape before it was played. Now, it's interesting. In this case, counsel did ask for redaction of other parts of the tape, and Judge Erickson responded by directing the prosecutors to mute those parts of the tape so they were not heard. So if counsel would have done the same thing with respect to this part of the tape, I think we can safely assume Judge Erickson would have said yeah and would have told the prosecutors to do the same thing. Simply an oversight on counsel's part, counsel failed to do that. And the danger, of course, is that the jury believed the officer had the requisite expertise and training to offer those opinions about knife wounds, believed he was being sincere when he made those statements, and thus relied on those statements, at least in part, in returning a verdict of guilty. And in this case, that possibility was enhanced when the prosecutor specifically told the jurors in closing argument that those wounds were likely incurred in the manner that Officer Ivey said on the videotape. So given the closeness of this case, the defendant submits this evidence was inadmissible. It carried a very high degree of prejudice. The obligation was on counsel to object. Counsel failed to do so. The defendant, therefore, received ineffective assistance. And for all of these reasons, Ms. Nolan McCune respectfully asks Your Honors to reverse and remand for a new trial in the event you do not reverse the conviction outright. Thank you, Mr. Fischer. Thank you, Your Honors. Good morning, Your Honors. May it please the Court, Mr. Fischer. The people submit that the evidence presented here was sufficient to not only prove the defendant guilty of first-degree murder, but, of course, more specifically, prove that the defendant did not act in self-defense. The people would submit, first of all, that the only evidence that the defendant was guilty of first-degree murder came through defendant's video, through her interrogation. And the people would argue very strongly that any evidence that she presented that she acted in self-defense was extremely improbable and not believable in any way, shape, or form. Therefore, the jury was clearly justified in not believing her statements. The big problem with her presentation of self-defense evidence was her credibility issues. It's obviously pretty clear that she lied, by and large, through the whole video. She denied going over to Jameson's. She denied being with Silva in the truck. She denied everything until she couldn't deny it any longer. And I believe that the jury clearly saw this, saw that this person was not being straightforward, not trying to cooperate in any way, and failed to believe any evidence of self-defense that she put forward. Would you think the evidence in this case could be described as falsely balanced? No, not at all, Your Honor, for a variety of reasons. Number one, we have the testimony of Richard Silva, who testified he didn't see a knife in Jameson's hand. And Jameson's boyfriend, Tian Claypool, also testified he didn't see a knife in Jameson's hand. Claypool said later that there were no knives missing in the whole house. So I think the evidence was pretty clear that Jameson didn't have this knife. What Claypool and Silva both testified is that this skirmish was wild and didn't last very long. And I think that goes right to disproving or undermining any suggestion that the defendant disarmed Jameson. So we have a very quick altercation. Defendant said in the video to Detective Ivey, he said, Jameson just produced this knife, and defendant, using her martial arts skills, disarmed Jameson with no real significant injuries to her. The people submit that that's just not believable at all. This is a wild skirmish, and she was able to smoothly and without really any harm to herself disarm Jameson in the manner which she told Detective Ivey. I don't believe that's believable. The jury obviously didn't think that was believable. And so you have that. And I think going back to defendant's credibility, so she testified that she – I'm sorry, she didn't testify. She told Ivey that the sequence of events was very clearly that she was with Silva. They went to the bar. Then she was mad. She was trying to find her son. Then they went to Jameson's. She remembered all that very clearly. She remembered honking the horn. She got out. One punch thrown by Jameson, one by defendant. Then Jameson pulled the knife out, and then defendant disarmed her. But from there, defendant very conveniently doesn't remember anything that happened after that. She said that she saw red. She didn't know how many times she hit Jameson. Going back to the car, I believe it was Silva. I'm sorry, no, that's not part of it. But anyway, I think it's very convenient, and I'm sure the jury saw that it was very convenient, that she remembered everything pretty clearly up until the point where she stabbed someone to death. I think that, again, goes to the credibility issues that really tarnished any self-defense defense that defendant tried to present. Defendant argued that the big issue here regarding self-defense is who brought the knife in the first place. People would argue that it was Jameson that did not have the knife. Silva testified, and Claypool testified she didn't have the knife. And defendant was saying that it matters who has the knife in the first place, but I think what really matters here is that before anybody was stabbed, the defendant had this knife. I don't think it matters who brought it because she had it before anyone was stabbed. So, as I argued in my brief, the knife that was never found. Okay. Yeah, the knife that was never found. And a knife that her passenger said he didn't see or have. He didn't see or have it at the beginning, no, but he did see or have it at the end. Again, Your Honor, I don't know if that necessarily matters because, as I argue, there's no debate that the defendant had this knife in her hand before anybody was stabbed. And the elements of self-defense, one of them is that there was... Well, you said she had the knife when she came back to the field. Yes, yes. But one of the elements of self-defense, of course, is there needs to be an imminent threat that you are responding to, but that necessitated the level of force that you used. Well, once the defendant had this knife, there was no imminent threat that she was going to be stabbed, assuming, for the sake of argument, that Jameson had this knife at any point. There's no evidence whatsoever that Jameson had this knife, but assuming she did, once the defendant took it from her, there was no threat that she was going to be stabbed. There was really no threat of any deadly force. But nevertheless, the defendant proceeded to stab her seven times, and three of those stab wounds were to the back of her head, which I argue, of course, how can there be an imminent threat to your well-being if this person isn't even facing you anymore and then you continue to stab them? Clearly, any threat had ended at this point once she had the knife. But she continued to stab. So you have forensic evidence that you just said something interesting, that she had her back turned to the defendant when she was stabbed. I didn't say that. I'm just drawing a reasonable inference from the testimony from the medical examiner that because there were wounds to the back of her head, I think it's reasonable to conclude that she was no longer facing the defendant at that point. But nevertheless, regardless. It's reasonable to conclude that she was. Sure. I guess you could probably stab somebody in the back of the head from the front. I guess that's possible. Of course. Sure. But the jury, again, what we need to focus on here is the jury heard all the evidence. The jury is the one who heard the medical evidence, heard the testimony of the witnesses. They weighed the credibility, obviously believed the defendant didn't have any through her statement and convicted the defendant. And the people would submit that the evidence was sufficient and the jury was rational in convicting a first-degree murder. Moving on to Issue 2, regarding Ivan's comments, the big question is what were those comments that he made regarding defensive wounds and slippage wounds? Were they error? People would submit that they were not. People would submit that these were simply the questions from a detective trying to find out what happened. That's all he was asking. Once the defendant finally started admitting that she had some role in this, again, she lied the whole way. So this is a defendant with a habitual liar trying to pinpoint exactly what happened. And that's exactly why he talked about these wounds. Regarding the slippage wounds, he suggested to her that the knife might have slipped. I mean, these aren't rock-solid allegations. He didn't even testify. As counsel stated quite clearly up here, when Detective Ivan took the stand, he didn't testify regarding slippage wounds or defensive wounds or anything. There are a lot of cases that the defendant cited where this type of evidence requires some sort of expert testimony. I'm not arguing with those cases whatsoever, but I'm just saying none of them are applicable here because there was no testimony that Detective Ivey is an expert or accused her of anything regarding the types of wounds that he saw on her. Again, I think these comments were very brief in a two-hour, around two-hour interrogation. They were very brief. They weren't a theme of his interrogation whatsoever. They were really just trying to get down to what happened in this case. And it's just in the normal course of an investigation, the type of speculation that the detective is afforded. Again, as counsel stated, the law says that officers do not have to tell the truth. They can mislead. This is not even as egregious as that. This is really just trying to find out what happened. And that's why those comments were not erroneous. And because those comments weren't erroneous, of course, the prosecutor didn't err in mentioning them later, and counsel wasn't effective for failing to move to have those redacted from the video. And some of the people submit that the defendant was properly proven guilty of first-degree murder, and they did prove that the defendant did not act in self-defense. So the people requested this court affirm the defendant's conviction and sentence. If there are any other questions, I'd be happy to answer them. If not, thank you. Thank you, Mr. McAllister. I appreciate it. You're welcome. Taking issue number two first, counsel says that these are just questions from the detective trying to find out what happened. Just so the court is very clear, the defendant is not arguing that Officer Ogden did anything wrong by asking these questions. As I say, the law allows him, even if he's being sincere, just to do it as a ruse or a ploy or what have you. And that's perfectly okay. This is not a suppression issue. It's an ineffective assistance of counsel issue. The counsel should have objected, but nothing the officer did wrong there. But it shouldn't have come before the jury. Counsel says, well, there was no testimony about it, and that's part of the problem here. Had there been testimony, we would have known. Were there qualifications? You could be cross-examined. It's kind of hard to cross-examine the take. And so those are my comments with respect to the second issue. With respect to the first issue, one of the arguments the state makes today and makes in the brief is that kind of an alternative argument, although the state's main argument is this woman brought the knife, she attacked Ms. Jamis. And the alternative argument by the state is that, well, if, as the defendant said, she at some point disarmed Ms. Jamis, and at that point she had to walk away, and at that point could not claim self-defense, had no reason to stab. That's why I say it appears from the testimony here that the disarming and the stabbing were practically simultaneous. Silva estimated, and he's not looking at a watch, presumably,  Jamison's boyfriend, again, who didn't witness the encounter, but he sees Jamison leave the residence and then later come back, and he says it's probably less than a minute. Oftentimes witnesses overestimate how long something takes. It's clear here that this happened over a very short period of time, and if the defendant was truthful, that she believed she was being threatened with a knife and her life was in danger, she's fighting for her life, and you can't stop and think, well, what's the next best course of action? It's not like a football game where you can review it in slow motion and say, oh, here, this is what he should have done at that point. This is happening in real time very quickly. The law does not require an individual who claims self-defense to use infallible judgment, nor does the law require an individual asserting self-defense to wait until the first blood is drawn. So we can't slow it down. It would be nice if we could, but we can't, and I think it's unreasonable to say, well, at some point she got the knife, so the danger is over. I don't think that's a realistic way of looking at the evidence. The defendant's initial denials, as I said before, yes, initially the defendant denied involvement. Thankfully, I've never been in a situation like that, but I think it's logical that one of the logical responses, one of the common responses to being accused by the police, being questioned by the police, even if you believe that what you did was completely 100% justified, you're going to be scared. You're going to be concerned. You're going to think, well, I should just deny as if I were a little kid and my parents were telling me you broke the lamp. I think you broke the lamp. No, no, it wasn't me. Even if you have self-defense, that doesn't mean in the long run the police are going to believe you. That doesn't mean in the long run that the jury is going to believe you. I think that's the common response to initially deny. Ultimately, she was up front. She said, yes, this is what happened, and by and large, many of her statements, much of what she said, was supported by Silva, even though, unfortunately, he didn't have the best view of this encounter. The problem is there are holes in this case. There are gaps, and that's not the prosecutor's fault. That's just what we've got here. There's no surveillance tape. Silva had a view, but not the best view, and the jury was forced to speculate, and that's not good enough. Yes, the jury can draw reasonable inferences from the evidence, but at some point, there's a boundary line between reasonable inferences and just outright speculation. To get to the court on this record, the jury had to speculate to get to the guilty verdict, and that is just not good enough under our system of criminal jurisprudence. The state says, well, the defendant at one point said she smoothly disarmed the knife. Well, we were off in the woods on our hands. That didn't happen. This was a traumatic event, obviously more traumatic for the victim, but even the other individual involved, it's a traumatic event, and you're trying to return it to that point under pressure. I mean, the evidence shows it wasn't smooth, and therefore it wasn't a situation where she could step back from the knife, whip the knife from Ms. Jameson, and end it right there. It's just not that easy on this evidence. The rest of the statements answer Your Honor, Justice Carter's question about closely balanced. It says, no, no, no, it's overwhelming. I realize this is a backup argument, but the statement is brief, argues an alternative, that there was a sufficient record to reduce to second degree. I think that's somewhat inconsistent with saying the evidence was not close. In any event, regardless, the defendant's position here, and I think it's abundantly supported by the record, is that the evidence was extremely close, so close that, well, that the evidence did not support a guilty verdict, because the state simply, on the evidence here, could not and did not carry its burden of disproving self-defense beyond a reasonable doubt. Alternatively, I don't think there's any realistic question that it was extremely close, and therefore, in the event Your Honors do not reverse outright, I would respectfully ask Your Honors to remand for a new trial. Thank you. Thank you, Your Honors. Thank you both for your argument today. We will take this matter under advisement, and the defense will be a written decision in the short term.